All right. Our last case for the day is People v. Lipsey, Kevin Lipsey, 5-24-0924. And I have Mr. Hanson for appellant and Ms. Wells. Is that correct? All right. Mr. Hanson, if you're ready to proceed. May it please the court, opposing counsel. I'm Craig Hanson. I represent the appellant in the case before the court today, Mr. Kevin Lipsey. I would beg the court's indulgence momentarily. I do wear hearing aids, so if I talk over you, it's not my intent to be rude. It's an infirmity that I have. Well, and to be quite fair, we've been having some feedback issues with the microphones today, so we'll hopefully get through without those.  Thank you, Your Honor. If you need to adjust, please let us know. We can do that. Actually, it seems we're doing very well here today. All right. Thank you. That's always a good thing. This issue concerns the trial court's implementation of Illinois Supreme Court Rule 431B, often referred to as the Zare Instructions. The argument here today can be broken down into two parts. One, the error itself, and two, the closely balanced nature of the case. The error itself is fairly apparent, and I'd like to spend a brief amount of time discussing that. But I think the second part, the closely balanced nature of the case, is going to be of more interest to the justices here, and we'll probably take up more time. I'm sure that's where more questions will come from. Here, during the court's inquiry of the veneer, the entire assemblage of prospective jurors, the court failed to ascertain whether the prospective jurors understood the four fundamental principles specified by Rule 431B and, of course, Zare. Before the court went on to ask the jurors later during the jury selection process whether they agreed or disagreed with each principle. We assert that a person's understanding of a proposition is a conditioned precedent to their acceptance of said proposition. To the extent the court addressed the entire veneer earlier in the jury selection process, recited these four principles, and asked whether the jurors understood these principles, the transcript of that proceeding reflects that the entire veneer, in unison, responded with a single yes. Not a show of hands, not head nods acknowledged by the bench, for the record, and certainly not with an opportunity for each prospective juror to individually indicate their understanding of any of these principles. The court did, later in the process, address jurors by row and asked for a show of hands as to whether the jurors agreed or disagreed with each proposition. And, of course, that show of hands was read to the record. To suggest that the court met the purpose and intent of Rule 431B by failing to ascertain the prospective juror's understanding of these principles requires a disregard of human senses, particularly hearing. It's simply not credible to assert that any human can discern a quiet yes, much less silence, from among a chorus of yeses. It's just not humanly possible. Accordingly, where the court's error is clear and obvious here, where the court failed to ascertain, as required by the rule and subsequent case law, that these jurors understood each of the four Zare principles, the error is obvious and is reviewable as plain error. With respect to the second part of the plain error analysis... I'm going to stop you real quick, counsel. Give me just a second. So, and we were talking about this a little earlier, I have dealt with these 431 cases now, been on this court six years, so the 431 Zare principles issues are kind of a stickler for me, and I don't understand why the trial courts can't ask the questions, do you understand and accept? I understand your point. I mean, why can't they just ask the question? But in this particular case, you referenced where the trial court went through and asked the question, and then asked the entire juror here if they understood that, and they all said yes. And then later, the trial court went through each proposition, and so I'm going to read. The first proposition is, do you understand, agree, and accept the principle that defendant is presumed innocent of the charges against him until proven otherwise? And then ask the same for all four principles, the three remaining ones. So, the trial court did say, understand and agree and accept, but then when asked the question, he said something to the like, he said, do you understand that? Didn't say, do you understand and accept? Your Honor, I believe you meant when he asked the specific question, he did not say understand, he said whether you agree or disagree. You're exactly right, I apologize. I just want to clarify that. Your Honor, yes. So, he didn't use the magic words when he asked the question to the juror. He said, do you disagree with that? Correct. When he addressed the individual juror, and he addressed the prospective jurors by row and asked for a show of hands, and the question posed to those jurors at that time was, do you agree or disagree, or some variation of that. Right. Didn't use the magic words. He did not use the magic words. If the magic word is understand, he did not use the magic word. So, what effect is any by him going through those four principles and saying, the first proposition is, do you understand, agree, and accept that, and went through the principles. What effect of any would that have in the analysis in this particular case? Well, the court's requirement under Rule 431B, Your Honor, is to ascertain the basic qualifications of the prospective jurors. And Rule 431B specifically directs the court to ask two things. Does a prospective juror understand the principle of the proposition, and do they accept the proposition? Those are two things that the court is required to ascertain. Here, the court did not provide the juror with an opportunity to indicate whether they understood or not. When they asked earlier, in the jury selection process, the jurors were not afforded an individual opportunity to respond, and there's no way the judge could have ascertained a juror remaining silent or a quiet yes among a chorus of no's. And to say, we disagree with the notion that the transcript, which records a large number of people saying yes, somehow makes that good just because the transcript says they all said yes, there's just no way to physically understand what each member of the veneer said. There was no show of hands. There was no nodding of heads. There was not an individual opportunity, which is something that the rule requires, and that did not happen. When the question of understanding was posed to the members of the veneer. Moving on from the error itself, of course, when doing the plain error analysis, you have two prongs, the first being the closely balanced error, the error itself, and one being closely balanced. For this error to matter, the case must be closely balanced. Here, we have no physical evidence placing a gun in Mr. Lipsy's hand. There's no DNA. There's no fingerprints. There's no photos, no firearms, nothing places a firearm in his hands on the day of the killing or any other day. Here, closely balanced cases are often compared to credibility contests between witnesses. Here, we have two eyewitnesses, Mr. Lipsy and Mr. Lopez. Both provide testimonial or description of events that align with the relatively large amount of circumstantial evidence. However, while Mr. Lipsy's version of events, some may consider to be incredible, I think the state is going to do a good job of doing that. Mr. Lopez's testimony differs significantly from his statements he made to police five days after the shooting. Mr. Lopez first said the shooters weren't wearing shirts, and then later on he claimed one of the shooters wore a polo and the other wore a tank top. Most significantly, when he talked with police, he said he didn't see a car in the driveway, the car that was the subject of the target of these shooters, apparently. He didn't see a car. He didn't know there was a car. He could not see a car. But when he got to trial, not only did he know it was a car, he described the color of the car. He described people being in the car, too, to be specific. That's a significant change. So Mr. Lopez's credibility is perhaps just as – I see my time is up. If it's all right with the presiding, I took some of your time. That's fine. Finish your thoughts, please. Thank you, Your Honor. Mr. Lopez also doubted. He didn't see the whole thing. That's according to his own testimony. We argue that the case is closely balanced, and for these reasons we respectfully ask this court to reverse Mr. Lipsy's conviction and sentence and remand for a new trial. Thank you, counsel. You left some time on your phone. Can I ask you a question? Yeah, I'm sorry. It's okay. I understand the overwhelming evidence argument and the inconsistency and whatnot, but how do you kind of get around or explain how the defendant had photographs, I think a video possibly, that may have been deleted from the phone, some of that other evidence that was, let's just say, damning on the defendant? To be clear, the piece of evidence you're referring to, Your Honor, just so I'm sure we're talking about the same thing, is a live photo. It's a photo that presents itself as a photo, but when you actually look at it, it has some movement and some audio recorded, and there's one photo, live photo, that does record some audio. I think it's probably best to describe it as a short video. Yes, as a matter of fact, I think it reflects Mr. Lipsy's poor judgment, some may consider it distasteful, but it does nothing to place a firearm in Mr. Lipsy's hands. His words, photograph, none of that speaks to him being the shooter or the killer in this case. It doesn't. It may represent monumentally bad judgment, but it is not damning evidence with respect to his culpability for the death of these two people. Thank you. Thank you, Your Honor. Okay. All right, we'll have time in the middle. Thank you. Thank you, Your Honor. All right, Ms. Fox. Thank you, Your Honor. Counsel, may I please report? The people agree that this comes down to two issues because one are plain error review. And so the first issue is if there was an error, people maintain that there was no error. The second issue is if there was an error, was the evidence so closely balanced that that error alone took the scales of justice against the defendant? And as this court is well aware, the burden of persuasion is undefended. So we're talking about a clear evidence error. And what we have here is a court that asked all four of their principals in one monologue and said, do you understand? And counsel says, oh, the record doesn't show that all the jurors said yes because how could it? Well, we know that the record, the court reporter also reported that they all said yes. But not only that, we have a judge that is in the courtroom face-to-face with the veneer that says all of the jurors said yes. That is the court's observations. And to take away from that court's observations and say the court did not hear what it didn't hear is absolutely attempting to establish clear and obvious error in the face of an affirmative record to the contrary. Now, would it, as the justice had indicated, to be easier if the judge had went through Court 31 and said what Ms. Anner said was magic words and not said understand at one point and later gone back and asked a compound question of all three. Do you understand, accept, and agree? And the court did that. So we actually have understand ask twice in this case, but you cannot take away because the plain language of the rule is asking individually or in a group and give them an opportunity to respond. And the opportunity to respond was they could have said yes or no, and what the court heard and what the court made a record was yes. And so we're trying to establish clear and obvious error in the face of that affirmative record of what the judge said he heard. And I'm sorry. I keep saying he, and I don't know if this judge is a male or a female. Wilmington is distinguishable. I put that in my brief because when the court first addressed the four principles, it didn't ask for any response. Here the court did. Do you understand? Not only that, but the court in Wilmington failed to ask about the final zero principle at all. In Milpat, the court didn't ask about whether the jurors understood the principles at all. Here we have the court talking about understanding not once, but twice. And while that second question was a compound question, may have been an article, it was a second opportunity for the jurors to indicate whether they understood or did not. In Daniel, the jurors were asked if they had heard the principle and whether they agreed with them or disagreed with them. They were never asked. The court did not mention understand at all. So this is a completely different case. And while maybe the trial court could have asked it better, she did ask all of the questions. If there are no questions about that first portion, I'll move on to whether the evidence was posted down. But I want to give the court an opportunity to ask any questions about whether there was error. I believe you covered what I asked opposing counsel regarding what the trial court asked for each principle. So I think you covered that. Yeah. But I believe that whether the evidence was closely balanced. And the SIPI analysis is very clear that it is a common sense analysis. And here what we have, and counsel below, argue that Oscar Lopez didn't have what one can refer to as a dog in the sky. He was an independent witness. And counsel below agreed with that, that Oscar Lopez had no reason to lie. Yet what we have here is a defendant making up impossible stories, lying over and over and over to the police until he's confronted with evidence to the contrary. So the plausibility of the defendant's story, I want to talk about several portions of that. First, he testified that despite a disagreement with Johnson, a demand for money back, and his belief that Johnson didn't want him to continue with the job, he, Johnson, gave him additional payment just days before the murder. Defendant claims that he heard gunfire inside the house. But then why did the statement came out before he left? That is impossible. You hear gunfire, you're out of there. His impossibility of his explanation continues to his returning. He went to his, he was on his way to St. Louis to get gas. Oh, but I didn't get gas. I get this phone call, so I go, I turn around. Even though I'm already in St. Louis, I don't get gas. And somebody has a broken pipe. And instead of going to a store, he goes back to the location of this horrible, horrific shooting where there are shell casings all over the place, two dead bodies. And he goes in the house with his sister to get a supply. Doesn't go to a paper. Doesn't go to the clothing supply store. Goes back into the scene of the shooting. He sees Ford hanging out of the car, but he still goes into the house. He sees Jackson dead on the floor. And instead of getting out of there, he performs this monologue about how Johnson is dead because he threatened the defendant. Absolutely impossible. And that's the common sense analysis that this court has to go through. Not only that, he attempts to explain away the audio by saying that he records the entirety of his life. And neither of his attempts make any sense, that they only contain a portion of what he said, because his explanation on the stand of what he said in addition doesn't match his language of what was recorded. His second attempt was, I am a child of God. God, don't play with me. Look at you now. And then goes into what was actually recorded. He doesn't speak like that. He didn't speak like that for his entire testimony. He admitted that his testimony was accurate, that he was present at the scene, that the timeline was accurate, the surveillance video of the trunk was accurate, that he was the driver, he was in the Home Depot video, and he was the one with the long braided hair. He was smiling and selfie-fixing. And his consciousness of guilt, when you just hear him lying over and over and over to the police and he's tall with evidence that places him there, is evidence of this situation. In fact, the Illinois Supreme Court just came out with a case where a defendant self-serving statements and the fact that he lied to the police several times meant that it wasn't closely balanced. And that was the Johnson case. 2025, Illinois, 130447. And that just came out, I believe it was October 31st. So I couldn't keep that in my brief. I'm sorry to stop you, Counselor. What was the last, the final numbers of that site? 130447, and I would direct the court to paragraph 53. Thank you. I can do a motion to second the judicial authority if the court would like me to, but I just found it yesterday and I didn't have an opportunity to file that. I don't think I have motions necessary at this point. Thank you, Your Honor. Defendant's own statements corroborate Mr. Lopez, and I would direct the court to all of the friends of information that corroborates Lopez. Defendant's own statements that corroborate Lopez. The scene that there was a car there, that it was dark, right? These are not things that would be found in a newspaper article. I see my time is up, so unless there are any other questions, I would ask that the court find that there was not a 431 violation, that even if the court does find that there was a violation of 431B, that the defendant was not closely balanced in a crime-dependent situation. Any questions? No questions. All right. Thank you very much. Mr. Hanson? Lopez? May it please the court, counsel. With respect to counsel's latest comment on the Johnson case, I know it has been the practice of this court not to accept oral motions at argument. I would ask, since opposing counsel has had the opportunity to ask this court to consider that, that I move for supplemental briefing on that case. I personally, I know we'll give you time. I mean, I'll suggest a question. I haven't seen this Johnson case. I obviously will want to look at it. If counsel would like to do a short supplemental brief within 14 to 21 days or so, I don't have a problem with that. It's up to, you know. I'm fine with that. Absolutely.  So, you know, how long? You know, we've got holidays coming up and whatnot. Shortly. Very shortly. Okay. And I don't know. Seven and seven. Seven for additional or supplemental briefing and then seven for a response. Is that appropriate? Or just do 14 both at the same? Give them both 14 to do a short supplemental? Would that be? Or how would you? I would prefer a very short supplemental. I know I recently did that in another three cases. The states provide their brief, and we would have the opportunity to consider the case and provide the court with that. Ms. Wallace, is seven days appropriate for you to file any supplemental briefing? Absolutely, Your Honor. Thank you. Seven pages in length and we'll give you seven days? A page or two is going to be sufficient at maximum. And then seven days to respond with the seven pages for response. Yes, Your Honor. Can we restart, Mr. Manson, on his time? Thank you. The first, going back to the error itself, the state certainly suggested that the court record is what it is and the court's finding sheet counsel conflates what was transcribed with the finding by the court. We think that's incorrect, and we would just rest on our argument that there is no way that a judge could ascertain silence or a lack of response from a juror from a course of guesses. It's simply not humanly possible. When the state described what the opportunity for jurors should be or is by law, they left out some pretty important words when they articulated what that opportunity ought to be. That opportunity is for each juror to have an opportunity to respond. Not the jury as a whole, not the veneer, each juror. And I just wanted to correct the record on that at that point with respect to what the law requires each juror be provided with with respect to the opportunity to indicate their understanding and acceptance. The state talked a lot about Mr. Lopez. The record reflects that trial counsel admitted there was no reason for Mr. Lopez to lie, and there is no apparent reason for him to lie. We're not aware of one. That doesn't mean he didn't lie. And because the record reflects he didn't have a reason to lie, it still does not explain the blatant inconsistencies between what he told the interviewing officers during his videotaped interview five days after the shooting and what he said in court. During that interview, he didn't see a car. There was no car. At trial, it was a gray car, and it was in the driveway, the driveway that he said he couldn't see when he was interviewed by police. That is a significant change in facts. He said he doubted. He didn't want to get shot. And yet he witnessed the entire event, which is true. There are significant inconsistencies. Does Mr. Lipsy's version of events cause one to raise their eyebrows? Perhaps. Both these accounts are consistent with timeline, which is not in dispute. Mr. Lipsy testified that that timeline was correct, and he was where his phone showed him to be. I see my time is up. We're coming to a close. Beyond that, the requirement here when looking at a closely balanced case is not a common sense analysis. It's a totality of the evidence analysis. And here we have two competing stories from two eyewitnesses, and that's what this court must consider. Again, we'd ask this court to consider the error made by the court, the closely balanced nature of the case, and reverse Mr. Lipsy's conviction and sentence, and remand for a new trial. Thank you, counsel. Thank you, Your Honor. We'll take this matter under advisement. We'll issue a ruling in due course, and we'll wait for your supplemental briefing, obviously, as well. All right? All right. Thank you very much, and we stand in recess until tomorrow. Thank you very much.